IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01840-WYD-BNB

David Clay;
Matthew Deherrera;
Lamont Morgan;
William LaFontaine; and
Cynthia Shaw-Pierce, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

Joe Pelle, in his official capacity as Boulder County Sheriff, and
Larry R. Hank, in his official capacity as administrator of the BCJ and Division Chief of the Boulder County Sheriff Office,

      Defendants.

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Mark Silverstein, Legal Director
Rebecca T. Wallace, Staff Attorney
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF
COLORADO
400 Corona Street
Denver, Colorado 80218
Telephone:  (303) 777-5482
Fax:  (303) 777-1773
Email: msilver2@att.net
       rtwallace@aclu-co.org

David C. Fathi, Director
NATIONAL PRISON PROJECT OF THE ACLU
FOUNDATION, INC.
915 15th Street NW, 7th Floor
Washington, D.C. 20005
(202) 548-6603
Email: dfathi@npp-aclu.org
*Not admitted in D.C.; practice limited to federal courts*
Counsel for Plaintiffs

**Rule 7.1 Certificate**

Pursuant to D.C.Colo.L.Civ.R. 7.1, Rebecca T. Wallace, counsel for Plaintiffs, conferred with Andy MacDonald, counsel for Defendants, who opposes this motion.

**INTRODUCTION**

In this case, prisoners mount a facial challenge to the recently-implemented postcard policy of the Boulder County Jail ("Jail" or "BCJ"). Under that policy, prisoners must use postcards for their personal correspondence to friends, family, and loved ones. Prisoners cannot write personal letters unless they are lucky enough to find out about, and lucky enough to successfully apply for, the jail's "official mail" exception to the postcard policy. The "official mail" exception is not only a standardless exception that Jail officials have unfettered discretion to grant or deny, but the Jail has also deliberately concealed the exception from the Jail population in order to deter letter-writing.

In this motion, Plaintiffs seek a preliminary injunction enjoining defendants from enforcing the postcard policy, or any other policy that limits prisoners' outgoing mail to postcards.[1]

**STATEMENT OF FACTS**

**I. The Jail's Implementation of the Postcard Policy**

Prior to March 8, 2010, BCJ inmates were permitted to write five letters each week, with paper, envelope, and postage supplied by the Jail. Doc. No. 15, Scheduling Order, Statement of Undisputed Facts (hereinafter "Undisputed Facts"), Fact e. Each letter could contain three sheets of 8.5 x 11 inch paper written on both sides. Undisputed Facts, Fact e. Beginning on March 8, 2010, the Jail implemented an outgoing mail policy limiting most inmate correspondence to

---

[1] This is identical to the preliminary injunction this Court entered upon stipulation of the parties in *Martinez v. Maketa*, No. 10-cv-02242-WYD-KLM, Doc. No. 37, December 20, 2010.

postcards (hereinafter "postcard policy").  Undisputed Facts, Fact e; *see* Ex. 1, Hank Depo., 156:12-16.  Pursuant to the postcard policy, inmates can write letters that will be enclosed and mailed out in envelopes only if they ask for and are granted permission to send correspondence as "legal mail" or "official mail."  *See* Statement of Undisputed Facts, Fact g.  According to Jail Division Chief Larry Hank, while inmates may "request permission" to send letters enclosed in envelopes to a defined set of individuals under the "official mail" exception to the postcard policy (which the Jail has rewritten no fewer than six times since March 2010), there is no guarantee that permission will be granted.  Ex. 1, Hank Depo., 180:8-15.

Chief Hank has explained that the Jail staff who review inmates' requests to send "official mail" have the "discretion" to grant or deny these requests.  *See, e.g.*, Ex. 1, Hank Depo., 123:6-22 (discretion to deny inmate's official mail request to send a letter professing his innocence), 124:15-125:14 (discretion to deny letter to parents "informing them of life updates"), *accord* 137:12-138:13,142:21-143:8, 148:1-148:15 (discretion to deny other requests to send official mail).  There are *no written criteria* to guide Jail staff in exercising this discretion, resulting in inconsistency in the Jail's application of the "official mail" exception.  Ex. 1, Hank Depo., 153:2-13.

The Jail takes pains to keep the "official mail" exception secret from prisoners in order to decrease the quantity of requests to send letters.  *See* Ex. 1, Hank Depo., 84:13-95:22 (admitting that one of the benefits of the postcard policy is that it deters inmates from writing letters).  To that end, the Jail does not inform inmates about the existence of the "official mail" exception. Ex. 1, Hank Depo., 155:1-7 (admitting that the Jail distributes no documents to inmates that mention the "official mail" exception and that the "official mail" exception is not discussed during  inmate orientation); *accord* Ex. 2, Black Depo., 60:10-13, 64:17-20, 65:3-8.  In fact, the

*only* document that the Jail distributes to inmates regarding outgoing mail focuses solely on postcards. *See* Ex. 3, Boulder County Jail Inmate Rules (revised March 2010). As a result, many inmates only learn of the official mail exception through *Plaintiffs' counsel*, rather than through the Jail. *See, e.g.*, Ex. 4, Abeyta Decl., ¶ 7; Ex. 5, Rios Decl., ¶ 10.

## II. The Jail Interests Purportedly Served by the Postcard Policy

Defendants state that they implemented the postcard policy in response to an incident in 2009 involving two Jail detainees, Gino Rael and Damien Whitehead. With the apparent help of a third party outside of the Jail, these two inmates sent letters to a number of young girls in the Boulder/Longmont community (hereinafter "Rael/Whitehead Incident").[2] Ex. 1, Hank Depo., 18:18-19:5; Ex. 2, Black Depo., 154:12-19. Chief Hank confirmed that the Jail's postcard policy serves no important governmental interest other than to prevent the type of third party mailings implicated in the Rael/Whitehead Incident. Ex. 1, Hank Depo., 67:11-68:9, 83:20-85:25.

At the time of the Rael/Whitehead Incident, the Jail allowed prisoners to seal their own personal letters before giving them to a jail staff for mailing, Ex. 2, Black Depo., 76:22-77:7, and the Jail did not require that envelopes given to prisoners be stamped with the Jail's return address, Ex. 2, Black Depo., 69:6-19. Chief Hank and Commander Black explained that, as a result of the Jail's outgoing mail policy at the time, inmates were easily able to send letters through intermediaries who then forwarded them on to girls in the community who were unaware that the letters they received were coming from prisoners. Ex. 1, Hank Depo., 59:16-23 (admitting that prior policy was "flawed"); Ex. 2, Black Depo., 115:14-116:1.

---

[2] These letters (hereinafter collectively referred to as "the Rael/Whitehead incident") contained no sexual content. Ex. 1, Hank Depo., 25:8-10. They did not violate any BCJ rules or criminal laws. Ex. 1, Hankd Depo., 23:7-13. The letters did not result in any monetary loss, physical harm, or sexual contact or abuse. Ex. 1 Hank Depo., 28:5-21.

3

### III. The Effects of the Postcard Policy on Prisoners and their Loved Ones

Joshua Nemnich, Vincent Abeyta, George Rios, and John A. Smith were incarcerated in the Jail before the postcard policy was adopted, and each has spent additional time in the Jail after it went into effect. All have found their communications dramatically stifled by the postcard policy.

Prior to the postcard policy, Mr. Nemnich wrote letters almost daily to his children, ex-wife, mother, and friends. Ex. 6, Nemnich Decl., ¶ 2. Once the postcard policy came into effect, he "rarely" corresponded with the outside world and did not write "anything personal on postcards" out of fear that inmates, jail officials or members of the public may read his personal thoughts and feelings. Ex. 6, Nemnich Decl., ¶ 2. When Mr. Nemnich attempted to use the "official mail" exception to send a letter to his wife, Commander Torres "angrily yelled at" him for attempting to help the ACLU in its "bullshit" lawsuit against the Jail. Ex. 6, Nemnich Decl., ¶ 5. As a result of this incident, Mr. Nemnich "feel[s] completely discouraged from attempting to communicate with [his] family by letter." Ex. 6, Nemnich Decl., ¶ 8.

Prior to the postcard policy, Mr. Abeyta sent three to five, multiple-page letters every week to his girlfriend and eight-year old son. Ex. 4, Abeyta Decl., ¶ 4. Since the postcard policy was implemented, Mr. Abeyta corresponds infrequently because the postcards provide little writing space, do not provide privacy, and do not allow him to send pictures he has drawn for his son. Ex. 4, Abeyta Decl. ¶ 5. After learning of the "official mail" exception through Plaintiffs' counsel, Mr. Abeyta requested to send his personal letters as official mail. Ex. 4, Abeyta Decl. ¶ 8. Commander Torres denied Mr. Abeyta's request and angrily reprimanded him, as well as other inmates who wrote similar requests. Ex. 4, Abeyta Decl., ¶ 8. Commander Torres warned that the attempt to use the official mail exception to send personal letters was not

4

"Phoenix behavior." Ex. 4, Abeyta Decl., ¶ 8.[3] Mr. Abeyta understood Commander Torres' statement to mean that further attempts to use the "official mail" exception to send personal letters could result in his transfer out of Phoenix. Ex. 4, Abeyta Decl. ¶ 9. As a result, Mr. Abeyta has not attempted to use the official mail exception to send out the numerous personal letters he wishes to send to his girlfriend and son. Ex. 4, Abeyta Decl. ¶¶ 9, 12.

Prior to the postcard policy, Mr. Smith wrote weekly, lengthy, personal letters to his wife and child, who live in Japan. Ex. 7, Smith Decl., ¶¶ 3-4. When Mr. Smith attempted to send a personal letter to his wife through the "official mail" exception, Commander Torres refused to grant the request unless Mr. Smith "disguise[d]" the letter as official mail by indicating in the letter that he needed a copy of his son's birth certificate from his wife. Ex. 7, Smith Decl., ¶ 5. Mr. Smith followed Commander Torres' instruction, and Commander Torres allowed the letter to go out as a "one-time exception" to the postcard policy. Ex. 7, Smith Decl., ¶ 5. Since that time, both Commander Torres and Commander Hill have told Mr. Smith that if he wants to correspond with his family in Japan, he must do so on a postcard. Ex. 7, Smith Decl., ¶ 6.

Prior to the postcard policy, Mr. Rios wrote multi-page, personal letters to his children and business partner to "keep [his] sanity" and maintain "connections with the world outside of jail." Ex. 5, Rios Decl., ¶¶ 2, 8-9. Since the postcard policy came into effect, Mr. Rios corresponds with the outside world much less often, due to the "tiny writing space and the lack of privacy that postcards provide." Ex. 5, Rios Decl., ¶ 5. Although Mr. Rios learned of the "official mail" exception through Plaintiffs' counsel, he has not attempted to use the exception to send personal letters, because he witnessed Commander Torres harshly reprimand three other inmates who attempted to do so. Ex. 5, Rios Decl., ¶ 12. Mr. Rios explains:

---

[3] Mr. Abeyta is currently incarcerated in the Phoenix Pod, a therapeutic community which is considered a privilege that can be revoked. Ex. 4, Abeyta Decl. ¶ 3.

> After that experience, I felt the Boulder County Jail had made very clear that personal letters could not qualify as "official mail." More importantly, it was clear to me that if I asked permission to use the official mail exception to write personal letters, I would be retaliated against by the jail staff. I am currently in the Phoenix Program at Boulder County Jail, where I am receiving really great therapy and classes. I do not want to risk losing these programs by trying to do what Joshua Nemnich and Vinnie Abeyta did – asking permission to send personal letters through the official mail exception.

Ex. 5, Rios Decl., ¶13.

## ARGUMENT

To obtain interim injunctive relief, the moving party must generally demonstrate "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). The plaintiffs here easily satisfy this test.[4]

### I. Plaintiffs are Substantially Likely to Succeed on the Merits of Their Constitutional Claims

"Correspondence between a prisoner and an outsider implicates the guarantee of freedom of speech under the First Amendment and a qualified liberty interest under the Fourteenth Amendment." *Treff v. Galetka*, 74 F.3d 191, 194 (10th Cir. 1996) (citing *Procunier v. Martinez*,

---

[4] Three types of "disfavored" injunctions require a heightened standard: "(1) preliminary injunctions that alter the status quo, (2) mandatory preliminary injunctions, and (3) preliminary injunctions that give the movant all the relief it would be entitled to if it prevailed in a full trial." *Id*. at 1208 n.3. The proposed injunction does not fall into any of the three disfavored categories. By temporarily enjoining the postcard rule, plaintiffs merely seek to return defendants' mail policy to the "last peaceable uncontested status existing between the parties before the dispute developed." *See Schrier v. University of Colorado*, 427 F.3d 1253, 1260 (10th Cir. 2005). Similarly, the proposed injunction is prohibitory rather than mandatory because enjoining the postcard policy "does not compel [the defendant] to do something it was not already doing during the last uncontested period preceding the injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001). Finally, the proposed injunction would not give plaintiffs all the relief they would be entitled to if they prevail in a full trial: it merely provides temporary, not permanent, protection for their First Amendment rights. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247-48 (10th Cir. 2001).

416 U.S. 396 (1974)). Unlike regulations on incoming mail, which are subject to the less stringent test set forth in *Turner v. Safley*, 482 U.S. 78 (1987) (regulation valid if it is reasonably related to legitimate penological interests), regulations that infringe upon First Amendment rights in prisoners' outgoing mail are subject to the stricter test set forth in *Martinez*. *Treff*, 74 F.3d at 194-95; s*ee also Jordan v. Pugh*, 504 F.Supp.2d 1109, 1120 (D. Colo. 2007) (invalidating outgoing mail regulation under *Martinez* test). The reason for this distinction is that "outgoing personal correspondence from prisoners . . . [does] not, by its very nature, pose a serious threat to prison order and security." *Thornburgh v. Abbott*, 490 U.S. 401, 411 (1989).

Under the *Martinez* test, a valid limitation on a prisoner's outgoing mail must meet two requirements. First, the "limitations on a prisoner's First Amendment rights in his outgoing mail 'must further an important or substantial governmental interest unrelated to the suppression of expression.'" *Treff*, 74 F.3d at 195 (*quoting Martinez*, 416 U.S. at 413). More specifically, the limitation must further "one or more of the substantial governmental interests of security, order, and rehabilitation." *Martinez*, 416 U.S. at 413. Second, "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Martinez*, 416 U.S. at 413; *Treff*, 74 F.3d at 195. [5]

### A. The Postcard Policy Substantially Burdens the First Amendment Rights of Both Prisoners and Their Free-World Correspondents

It is undisputed that the postcard policy significantly limits the amount of written correspondence prisoners can send, Ex. 1, Hank Depo., 99:8-13, and that it may chill prisoners from writing about personal subjects, Ex. 2, Black Depo., 123:22-124:1. And it is obvious that a

---

[5] Article II, section 10 of the Colorado Constitution provides broader protection of speech than the First Amendment. *See Bock v. Westminster Mall Company*, 819 P.2d 55, 59-60 (Colo. 1991). Thus, while this brief discusses only plaintiffs' claims under the First Amendment, a policy that violates the First Amendment *a fortiori* violates Art. II, sec. 10.

prisoner who is allowed to send only a postcard cannot enclose drawings, newspaper clippings, religious tracts, or other expressive materials.  The Supreme Court has explained that such restrictions on prisoners' written communications infringe not only the prisoners' First Amendment rights, but also the rights of family members and others who wish to receive the prisoners' correspondence:

> Communication by letter is not accomplished by the act of writing words on paper. Rather, it is effected only when the letter is read by the addressee. Both parties to the correspondence have an interest in securing that result, and censorship of the communication between them necessarily impinges on the interest of each. . . . The wife of a prison inmate who is not permitted to read all that her husband wanted to say to her has suffered an abridgment of her interest in communicating with him as plain as that which results from censorship of her letter to him. In either event, censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners.

*Martinez*, 416 U.S. at 408-09.  Thus, the restrictions challenged here substantially implicate the First Amendment rights of the individual plaintiffs, all current and future jail prisoners, and all persons in the outside world who wish to read what the prisoners would like to communicate.

### B. The Postcard Policy is Neither Necessary Nor Essential to Advance Any Important or Substantial Governmental Interest

In this case, Defendants identify only one interest that purportedly justifies the postcard policy: preventing the kind of third-party mailings involved in the Rael/Whitehead Incident.  Ex. 1, Hank Depo., 67:11-68:9, 83:20-85:25.  Plaintiffs agree that preventing such misuse of the mail is an important governmental interest.  *See Martinez*, 416 U.S. at 413.  However, restricting outgoing prisoner mail to postcards instead of letters is neither necessary nor essential to serve that interest.

As a threshold matter, it is important to note that until 2010, the Jail freely allowed prisoners to send personal mail in envelopes.  Indeed, until 2010, *no jail in Colorado* limited prisoners' outgoing mail to postcards, and *no other Colorado jail currently does so*.  Ex. 8,

8

Martin Decl., ¶ 16.  Neither the Colorado Department of Corrections nor the Federal Bureau of Prisons limits outgoing mail to postcards.  Ex. 8, Martin Decl., ¶ 15.  The federal "supermax" prison in Florence, Colorado, which confines prisoners with the highest security classifications in the United States, does not limit outgoing mail to postcards.  Ex. 8, Martin Decl., ¶ 15.  Thus, while all these jails and prisons presumably share the defendants' interest in preventing inappropriate use of outgoing mail, not one of them resorts to the Jail's drastic "solution."

These facts alone argue powerfully against a finding that the postcard policy is "necessary or essential" to protect the defendants' asserted interest.  *See Martinez*, 416 U.S. at 414 n. 14 ("While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction"); Ex. 2, Black Depo., 161:12-15 (BCJ does not face any special security concerns related to outgoing mail that other jails of similar size do not face); Ex. 1, Hank Depo., 86:11-14 (same).[6]

Steve J. Martin is an expert with over 38 years of experience in correctional administration, including substantial experience in implementation and management of correspondence rules and regulations in jails and prisons.  *See* Ex. 8, Martin Decl., ¶¶ 2-4.  After reviewing voluminous materials in this case, he concludes that the postcard policy is neither necessary nor essential to further the Jail's interests:

---

[6] Not surprisingly, the postcard policy has not halted inappropriate use of outgoing mail by jail detainees; at least one detainee was able to send numerous postcards to his former domestic partner, in violation of a protective order.  *See* Ex. 9, Grimaldo Police Reports, p. 6.  Indeed, Commander Black is aware of no evidence that inmate misconduct related to the use of outgoing mail has decreased since implementation of the postcard policy, Black Depo., 161:3-7, and Chief Hank concedes that if Rael and Whitehead were currently in the Jail, the postcard policy would not prevent them from writing to young girls, Hank Depo., 54:7-12.  Thus, even if defendants were to assert a broader interest in preventing inappropriate use of outgoing mail, these admissions make clear that the postcard policy is not "necessary or essential"—or even effective – to  advance that interest.

> The BCJ policy that limits outgoing, non-legal mail to 5.5" x 8.5" postcards is not necessary or essential to further any legitimate interests in security or order.  Such a policy unnecessarily limits inmate opportunities to engage in lawful and routinely accepted correspondence practices.  Moreover, such a policy is not necessary or essential to address the correspondence issues evident in the Rael/Whitehead incident….

Ex. 8, Martin Decl., ¶ 14.

Indeed, defendants *admit* that the following alternatives to the postcard policy would have addressed the concerns raised by the Rael/Whitehead incident: (1) pre-stamping envelopes given to detainees with BCJ's return address, Ex. 2, Black Depo., 115:14-21; (2) watermarking the writing paper given to detainees, Ex. 1, Hank Depo., 57:25-58:6; and (3) hand-searching outgoing mail, Ex. 1, Hank Depo., 64:21-65:4.  However, *defendants never even considered these or any other alternatives to the postcard policy.*  Black Depo, 158:1-10.  Asked why the Jail did not consider watermarking as an alternative, defendant Hank replied, "I believe this policy is constitutional.  I'm satisfied with this policy." Ex. 1, Hank Depo., 58:10-11, 94:10-12 ("You've talked about other policies that you believe are alternatives.  I agree that they're alternatives.  This is the one I prefer").[7]

---

[7] Other less restrictive alternatives also exist.  It is settled law that jail officials may inspect outgoing letters to determine whether they "fall[] into a category which poses a threat, including escape plans, plans related to ongoing criminal activity, and threats of blackmail or extortion."  *Beville v. Ednie*, 74 F.3d 210, 213-14 (10th Cir. 1996) (internal citations and quotations omitted).  They may also require that outgoing envelopes be left unsealed to facilitate this inspection.  *See Stow v. Grimaldi*, 993 F.2d 1002, 1004 (1st Cir. 1993).  Thus, defendants here can inspect all outgoing letters; outgoing letters sent by high-risk prisoners; outgoing letters they believe may pose a security risk; or a random sample of outgoing letters.  Defendants have not explained – and they will not be able to demonstrate with evidence – why these alternatives do not fully satisfy security needs.  *See Beerheide v. Suthers,* 286 F.3d 1179, 1189 (10th Cir. 2002) (even under the more deferential *Turner* test, "[i]n order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals") (emphasis in original).  *See also Johnson v. Smith,* 2011 WL 344085 (N.D. Ga., Feb. 1, 2011), at *5 (prisoner's challenge to jail policy limiting outgoing mail to postcards states First Amendment claim; "Plaintiff may argue that Jail officials could address their concerns by the less restrictive measure of requiring that general outgoing mail be placed in unsealed envelopes . . . instead of altogether limiting the type and size of the medium used for such mail").

### C. Defendant's Secret "Official Mail" Exception to the Postcard Policy Does Not Cure its Deficiencies

Defendants may contend that their addition of an "official mail" exception to the postcard policy cures its constitutional deficiencies. This claim fails for four independent reasons.

First, the very existence of the "official mail" exception is concealed from BCJ detainees. *See* pp. 2-3, *supra.* As Judge Krieger cogently explained in *Jordan v. Pugh*, 504 F. Supp. 2d 1109, 1117-18 & n.23 (D. Colo. 2007), such a secret exception cannot undo or counteract the chilling effect of the policy that is actually publicized and communicated to the inmate population. In *Jordan*, the prisoner plaintiff challenged a regulation that was described as the "Byline Regulation." The court properly analyzed it as chilling the expression not only of the plaintiff, but also of numerous other prisoners who were not before the court. Defendants asked that the court consider the challenged regulation in light of two additional documents they created in response to the lawsuit: the "ADX Institution Supplement" and "the Kenney Memorandum." In reasoning that clearly applies to this case, the court explained that neither document fundamentally alters "the chilling effect of the Byline Regulation upon an inmate's freedom of expression of ideas to news media." 504 F. Supp. 2d at 1118. The court explained:

> The Institution Supplement and the Kenney Memorandum were adopted in response to this lawsuit. They do not, and cannot, change or replace the unequivocal language of the Byline Regulation. They can be withdrawn or further revised at any time. In addition, neither the Institution Supplement nor the Kenney Memorandum have been published to any inmate other than [the plaintiff].

*Id.* at 1118. The same considerations apply in this case. It is in response to this controversy and this litigation that Defendants have repeatedly reformulated the "official mail" exception, without informing the prisoners of the changes. This secret exception does not change the "unequivocal language" of the document actually distributed to prisoners, which notes only that

11

prisoners are provided postcards on which to send correspondence. *See* Ex. 3. The secret exception can be withdrawn or further revised at any time. And finally, the secret exception has not been distributed or publicized to the prisoner population. Accordingly, this Court cannot accept defendants' invitation to regard their secret "official mail" exception as somehow reducing or eliminating the chilling effect of the restrictive postcard policy that has been announced to the prisoners.

Second, even for those prisoners who manage to learn of the secret "official mail" exception, the procedural hurdles to seeking permission to send "official mail" ensure that few prisoners will do so. Under the "official mail" exception, a detainee is required to first write the entire letter he wishes to send and give it to a supervisor before he will know whether his request for an envelope will be granted. Ex. 1, Hank Depo., 77:6-12, 180:8-15. Few detainees will go to the trouble to hand-write a five-page letter if there is a substantial risk they will be denied permission to mail it.

Third, in his deposition, Chief Hank repeatedly stated that BCJ staff have broad "discretion" to deny requests to send letters as official mail. *See* Ex. 1, Hank Depo., 123:6-22, 124:15-125:14, 137:12-138:13,142:21-143:8, 148:1-148:15. Yet, the "official mail" exception contains *no written criteria* to guide Jail staff in exercising their discretion to approve or deny these requests. Ex. 1, Hank Depo., 153:2-13. This lack of written criteria allows Jail staff to engage in the standardless exercise of unfettered discretion that has been repeatedly struck down on First Amendment grounds. In *Martinez* itself, the Supreme Court invalidated the outgoing prisoner mail regulations at issue there, finding that their vague nature "fairly invited prison officials and employees to apply their own personal prejudices and opinions as standards for mail censorship." 416 U.S. at 415. Similarly, in *Cofone v. Manson*, 409 F. Supp. 1033 (D. Conn.

12

1976), the court relied on *Martinez* to invalidate a mail rule that allowed rejection of publications that "obstruct rehabilitative objectives," holding that "the first amendment will not allow a catchall regulation which permits the exercise of unbridled discretion." *Id*. at 1041.

It should come as no surprise that the exercise of this unbridled discretion by Jail staff to grant or deny "official mail" request has resulted in arbitrary and inexplicable denials of permission to send "official mail." *See, e.g.,* Exs. 4-7, Inmate Decls.; *see also* Ex. 1, Hank Depo., 153:2-13 (admitting that failures in training and supervision as well as lack of written criteria have resulted in inconsistent application of the Jail's "official mail" exception).

Finally, Chief Hank's testimony makes clear that, notwithstanding the existence of the "official mail" exception, the postcard policy continues to result in censorship of core First Amendment-protected speech. Chief Hank confirmed that Jail staff were acting consistently with Jail policy when denying multiple "official mail" requests based on the content of the prisoners' proposed letters:

> Q: So is it fair to say that pursuant to Boulder County Sheriff's Office official policy, Commander Torres had the discretion to deny an inmate's official mail request to send a letter professing his innocence?
>
> A: Yes, he has that discretion.

Ex. 1, Hank Depo., p. 123; *see also id.* at 123:6-22, 124:15-125:14, 137:12-138:13,142:21-143:8, 148:1-148:15. For all of these reasons, plaintiffs are substantially likely to succeed on the merits of their First Amendment claims.

## II. Plaintiffs Will Suffer Irreparable Injury if the Preliminary Injunction is Denied

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Howard v. United States*, 864 F. Supp. 1019, 1028 (D. Colo. 1994). More specifically, "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pacific Frontier v.*

13

*Pleasant Grove City,* 414 F.3d 1221, 1235 (10th Cir. 2005) ((quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); s*ee also Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (holding that even a "minimal restriction" on the manner in which dancers may convey their artistic message constitutes irreparable injury). Accordingly, when government action threatens First Amendment rights, as in this case, there is a presumption of sufficient irreparable injury to warrant a preliminary injunction. *Cmty. Communications Co. v. City of Boulder*, 660 F.2d 1370, 1376 (10th Cir. 1981).

### III.   The Balance of Equities Tips Sharply in Plaintiffs' Favor

In this case, the balance of equities clearly favors the plaintiffs. The postcard policy heavily burdens the First Amendment rights of both prisoners and their free-world correspondents – a burden that constitutes irreparable injury as a matter of law. By contrast, the defendants will suffer no significant harm if the policy is temporarily enjoined. The preliminary injunction would merely bar the Jail from restricting outgoing prisoner mail to postcards; the Jail would remain free to implement any or all of the less restrictive alternatives defendants concede would address their security concerns. *See* p. 10, *supra.* Accordingly, the balance of equities tips sharply in plaintiffs' favor. *See American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) ("the threatened injury to Plaintiffs' constitutionally protected speech outweighs whatever damage the preliminary injunction may cause Defendants' inability to enforce what appears to be an unconstitutional statute").

### IV.   The Injunction is in the Public Interest

"[A]s far as the public interest is concerned, it is axiomatic that the preservation of First Amendment rights serves everyone's best interest." *Local Org. Comm., Denver Chap., Million Man March v. Cook*, 922 F. Supp. 1494, 1501 (D. Colo. 1996); *accord Elam Constr. v. Reg. Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir. 1997) ("The public interest . . . favors plaintiffs'

14

assertion of their First Amendment rights"); *Johnson*, 194 F.3d at 1163 ("the preliminary injunction will not be adverse to the public interest as it will protect the free expression" of Internet users). The injunction plaintiffs seek would serve the public interest while leaving Jail officials fully capable of addressing legitimate security concerns.

**V.      No Security Should Be Required**

Fed. R. Civ. P. 65(c) provides that a preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined or restrained." However, "trial courts have wide discretion under Rule 65(c) in determining whether to require security," *RoDa Drilling Co.*, 552 F.3d at 1215 (internal quotations omitted), and may decline to require security in appropriate cases. *See, e.g., Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (no bond necessary where there was no showing of harm from injunction); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (finding no bond necessary where plaintiff had strong likelihood of success on merits). This is a case in which plaintiffs have a strong likelihood of success on the merits, and defendants will suffer no harm from the injunction. Accordingly, no security should be required.

## CONCLUSION

For the foregoing reasons, the motion for preliminary injunction should be granted. The Court should enjoin the defendants from continuing to enforce the challenged postcard policy, or any other policy that limits outgoing mail to postcards, thus restoring the status quo that existed before this controversy began.

Respectfully submitted, February 17, 2011.

          s/Mark Silverstein_____
          Mark Silverstein
          Rebecca T. Wallace
          American Civil Liberties Union Foundation of Colorado
          400 Corona Street
          Denver, Colorado 80218
          Telephone: (303) 777-5482
          Fax: (303) 777-1773
          Email: msilver2@att.net

          s/David C. Fathi_____
          David C. Fathi
          Director
          National Prison Project of the ACLU Foundation, Inc.
          915 15th Street NW, 7th Floor
          Washington, D.C. 20005
          (202) 548-6603
          Email: dfathi@npp-aclu.org
          *Not admitted in DC; practice limited to federal courts*

         **Attorneys for Plaintiffs**

### CERTIFICATE OF SERVICE

  I hereby certify that on February 17, 2011 I electronically filed the foregoing **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following address:

Andrew Ross Macdonald
Assistant County Attorney
BOULDER COUNTY ATTORNEY'S OFFICE
PO Box 471
Boulder, CO 80306
Ph: (303) 441-3190
Fax: (303) 441-4794
amacdonald@bouldercounty.org


          **s**/Debra Woods_____